UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 05-414(PLF) |
| | : | |
| v. | : | |
| | : | |
| MARK SCOTT | : | |

### GOVERNMENT'S MOTION FOR GUIDELINES CREDIT AND MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court, pursuant to § 3E1.1(b)(2) of the Sentencing Guidelines, to adjust the defendant's offense level down one level reflecting the defendant's early plea of guilty in this matter, which permitted the government to avoid preparing for trial and permitted the court to allocate its resources efficiently.  The United States also submits this memorandum in aid of sentencing.  For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant to 120 months for the offense of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year and 36 months for the offense of Attempted First Degree Sexual Abuse, to be served consecutively.

**I.     BACKGROUND**

On January 27, 2006, the defendant pled guilty to a two count Superceding Information that charged him with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year  in violation of  18 U.S.C. § 922(g)(1),  and Attempted First Degree Sexual Abuse, in violation of  22 D.C. Code §§ 3002; 3018.  In entering this plea of guilty, the defendant admitted to the following:

On May 30, 2005, at approximately 11:30 p.m., the defendant saw K.W., his former

girlfriend and mother of his three year old child, standing at a bus stop near the corner of Minnesota and Pennsylvania Avenues, Southeast, Washington, D.C. Defendant pulled up to K.W. in a van and forced K.W. into the van by grabbing and choking her neck and assaulting her. Defendant told K.W. he was going to shoot and kill her. Defendant then drove K.W. to 3693 Jay Street, Northeast, Apartment 202, where he had been living with his sister. A police cruiser drove past the defendant's van while he and K.W. were parked outside of defendant's residence. Defendant told K.W. that he would kill her and the police officer if the officer approached his van. K.W. believed defendant was armed because of his statements and because she knew defendant possessed a firearm in the past.

Defendant then took K.W. into his residence, apartment number 202. Once inside, defendant spoke to his sister, Kelly Hayes, and his sister's boyfriend, both of whom were in the bedroom. The bedroom was separated from the living room area by a door. Defendant and K.W. remained in the living room area of the apartment, where they talked for a while. Defendant tried to convince K.W. to get back together, but K.W. refused. Sometime after midnight, defendant removed a 12 gauge shotgun from underneath a sofa, pointed the gun at K.W.' head, and ordered her to take off her clothes. Fearing for her life, K.W. complied. Defendant then raped K.W. by forcing her to have oral sex. Afterwards, K.W. asked defendant to take her home, but defendant refused, saying he would only take her to her new home: the cemetery. Again fearing for her life, K.W. agreed to stay inside the apartment. K.W. did not report the sexual assault to anyone in the apartment because she feared for her life.

Around 1:00 p.m. on May 31, 2005, the defendant drove K.W.. to her home. Defendant then left to take K.W.'s child to a doctor's appointment. Immediately after defendant left, K.W. reported the sexual assault to her sister and friend, and one of them called the police to report the assault.

After being interviewed by police, K.W. was taken to the hospital for examination and treatment. While waiting to be seen, defendant called K.W. from the police station and asked her why she was pressing charges against him.

Defendant was arrested and gave a statement, which was video taped. Defendant claimed that his sexual contacts with K.W. were consensual. Defendant again called K.W. from jail and asked her not to pursue the case.

On Wednesday, June 1, 2005, members of the Metropolitan Police Department responded to 3693 Jay Street, NE, apartment 202, and arrested the defendant. After the defendant was arrested, his sister gave MPD written consent to search the apartment. The defendant also consented to the search, and called his sister from the station and told her to give the officers his shotgun. During the search the officers recovered a black duffle bag containing a Maverick model 88 12 gauge shotgun with no serial number and 23 shotgun shells. These items were found underneath the sofa in the living room.

The defendant waived his rights and provided a videotaped statement in which he admitted that he owned a shotgun which could be found underneath the sofabed in his sister's living room. The defendant knowingly and intentionally possessed the Maverick model 88 12 gauge shotgun with no serial number and 23 shotgun shells. The Maverick model 88 12 gauge shotgun with no serial number and 23 shotgun shells traveled from another state into the District Columbia on or before June 1, 2005.

At the time of his arrest, the defendant had the following criminal convictions: obstruction of justice and simple assault (D.C. Superior Court Case F-7311-94), carrying a pistol without a license and attempted unauthorized use of a vehicle (D.C. Superior Court Case F-5410-92),

possession with the intent to distribute heroin (D.C. Superior Court Case F-5268-02), and escape (D.C. Superior Court Case F-2870-03).

## II.     SENTENCING CALCULATION

### A     Statutory Minimums and Maximums

Pursuant to 18 United States Code §922 and § 924, Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year carries a maximum sentence of 10 years imprisonment, a $250,000 fine and up to three years of supervised release.

Pursuant to 22 D.C. Code § 3002 and § 3018, the offense of Attempted First Degree Sexual Abuse carries a maximum sentence of 15 years imprisonment, a fine not to exceed $125,000 and up to three years supervised release.

### B.     Federal Sentencing Guideline Calculation

The Guidelines calculations utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 37. See PSR ¶ 29. This offense level takes into account a three level adjustment for acceptance of responsibility. The PSR calculates the defendant's criminal history as Category V. See PSR ¶ 45. Therefore, the guideline range for the defendant is calculated at 324 to 405 months. See PSR ¶ 89. Pursuant to the plea agreement in this case, the government agreed to allocute for a sentence at the low end of the guideline range for this offense. However, where the statutorily authorized maximum sentence is less than the minimum of the applicable guidelines range, the statutorily authorized maximum sentence shall be the guideline sentence. See U.S.S.G. § 5G1.1(a) and PSR ¶ 94. Thus, for the reasons set forth, infra Section III of this Memorandum, the government respectfully recommends that the Court sentence the defendant to

120 months for count one of the Superceding Information.

    C.    <u>District of Columbia Sentencing Guideline Calculation</u>

The PSR writer also consulted the District of Columbia voluntary sentencing guidelines for count two of the Information: and three of the indictment: Attempted First Degree Sexual Abuse. The defendant's guideline range for this offense is 36 to 78 months. <u>See</u> PSR ¶ 93. For the reasons set forth, <u>infra</u> Section III of this Memorandum, the government respectfully recommends that the Court sentence the defendant to 36 months for count two of the Superceding Information.

**III.    GOVERNMENT'S RECOMMENDATIONS**

    A.    <u>Acceptance of Responsibility</u>

The government agrees that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines. He entered a guilty plea early enough in the proceedings to avoid the government's having to prepare for trial, and he appears to have met the requirements of Section 3E1.1 with respect to cooperating in the pre-sentence investigation. Accordingly, the government is moving the Court to grant the additional one level decrease in base offense level provided for in that Guideline provision.

    B.    <u>Application of the Federal Guidelines post-Booker</u>

Pursuant to the plea agreement between the government and the defendant, it is the government's position that the Court should impose a sentence within the guidelines range. In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States

Code, Section 3553(b)(1).  Booker, 125 S. Ct. at 756.  However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  Id. at 769.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)).  In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country,

and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions

. . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See Booker, 125 S. Ct. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section

3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances. This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the

Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." <u>Id.</u> at 912. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing. Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report for Count One.

      C.    <u>Application of the District of Columbia Superior Court Sentencing Guidelines</u>

In December 2003, the District of Columbia Advisory Commission on Sentencing recommended that sentencing guidelines be introduced in D.C. Superior Court. Such guidelines were promulgated and instituted in June 2004. The D.C. Superior Court Guidelines are, and always have been, voluntary. However, for the reasons discussed in section B above, the government respectfully recommends that the Court sentence the defendant within the D.C. Guidelines range as calculated in the Presentence Report for Count Two.

      D.    <u>Basis for Government's Sentencing Recommendation</u>

The defendant's criminal history supports the government's request for a significant period of incarceration in this case. At only thirty-eight years of age, the defendant is a relatively young man. And yet, despite his young age, the defendant has already accumulated an extensive criminal record. The defendant's contacts with the criminal justice system span sixteen years. He has ten adult convictions. Of those convictions, three are drug offenses. In fact, the defendant was on

supervised release in not one, but two cases when he committed the current offenses. (He was on supervised release in Superior Court case F-5268-02 and Superior Court case F2870-03.) Equally troubling is the fact that the defendant was required to submit to a sex offender evaluation based on a rape charge in case F7311-94. The defendant failed to cooperate with the treatment process, and a violation was pending prior to the defendants arrest in the instant case. See PSR ¶ 40.

The defendant's criminal history makes it very clear that he is a danger to others - especially those with whom he is romantically involved. He has a 1994 conviction for assaulting a former girlfriend, who was also the mother of two of his children. Furthermore, in 2004 the defendant wrote a series of letters to the victim in the instant case which confirm his dangerous nature. In those letters the defendant made the following statements:

- "I will do what it takes to get what I want and will kill to get it that means every and anybody that stands in my way of having you."
- "I be want to kill [K.W.] but I really lover her."
- "I'm made as shit and will hurt you really now because of all this shit you have done to me and said to me got me fucked up. All I want is to get you now. And if you don' come to see me on Thursday before I go to the Fed when I get out I will find you and kill you for everything you did to me wrong and the whole time I was in jail like I said I don't have shit to loose now so if you don't want beefing or killing to happen you better come to talk to me on Thursday . . . ."
- "I'm a killer for life that's all I do kill kill kill kill kill kill kill yes."

Any one of these statements is enough to cause concern, but taken as a whole, and combined with the fact that the defendant has proven that he has the capacity for violence, these statements are

-11-

extremely disturbing.

The defendant also has a record of poor performance while on probation. Probation was terminated unsuccessfully in two of the defendant's prior cases, and he absconded from supervision in a third case.

Nothing, including the passage of time, should diminish in any way, the consequences the defendant's actions on his victim. K.W. has the right to be safe from violence and harm, and to live her life without fear. Each of these rights was violated by the defendant's conduct in this case, and each of these violations should be taken into account when the Court imposes its sentence.

## IV.   CONCLUSION

Wherefore, the government respectfully requests that the Court sentence the defendant to 120 months for the offense of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year and 36 months for the offense of Attempted First Degree Sexual Abuse. The government requests that these sentences be served consecutively, and be followed by an extensive period of supervised release. The government also requests that the defendant be ordered to register as a sex offender, pursuant to 22 D.C. Code §§ 4001(6)(D) and 4002(b)(1).

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
Bar No. 451058

_____
Catherine K. Connelly
Assistant United States Attorney
Mass. Bar No. 649430
555 4th Street, N.W.  #4844
Washington, DC 20001

<u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, Tony Axam, this 21st day of July, 2006.

_____
Catherine Connelly
Assistant United States Attorney